United States District Court
for the
Southern District of Florida

| | |
|---|---|
| Kenneth B. Schurr, Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 21-20092-Civ-Scola |
| | ) |
| AIG Property Casualty Company, | ) |
| Defendant. | ) |

### Order on Cross-Motions for Summary Judgment

Plaintiff Kenneth B. Schurr brought this breach of contract action against Defendant AIG Property Casualty Company ("AIG") after AIG denied coverage for a loss he claimed under his homeowner's insurance policy. Both parties submitted motions for summary judgment (Pl.'s Mot., ECF No. 25; AIG's Mot., ECF No. 19) and each party's motion has been fully briefed. For the reasons below, the Court **grants** Mr. Schurr's motion (**ECF No. 25**) and **denies** AIG's motion (**ECF No. 19**). All other pending motions are **denied as moot**.

### 1. Background

On December 20, 2012, Mr. Schurr assumed a personal debt of $148,341.35. (Promissory Note, ECF No. 1-4.) In November 2019, Mr. Schurr wired $124,690.66 to an account at BB&T to pay that debt down. (*See* AIG's Statement of Material Facts ["SOMF"] ¶ 7, ECF No. 20; Pl.'s SOMF ¶ 15, ECF No. 24.) About a month later, Mr. Schurr learned that the money he sent had not reached his creditor. Mr. Schurr had been duped. A fraudster impersonating the creditor had sent Mr. Schurr the wire instructions he used. (Corrected Aff. Kenneth B. Schurr, ECF No. 19 at 193; Pl.'s SOMF ¶ 16.) Mr. Schurr reported the event as a loss of $124,690.66 to AIG on December 23, 2019. (AIG's SOMF ¶ 6; Pl.'s Am. Resp. to AIG's SOMF  ¶ 6, ECF No. 32.)

Mr. Schurr's policy includes AIG's "Fraud SafeGuard" endorsement, which insures an event of "fraud, embezzlement, or forgery" up to $100,000 subject to a $250 deductible. (*See* AIG's SOMF ¶ 2; Pl.'s SOMF ¶ 3.) It says:

> "We will pay you or a **family member** for loss of **money, securities** or **other property** up to the applicable Limits of Insurance shown in the schedule, resulting directly from **fraud, embezzlement** or **forgery** perpetrated against you or a **family member** during the Policy Period. The loss must be discovered not later than ninety (90) days from the end of the Policy Period."

(emphasis in original) (AIG Policy 42, ECF No. 25-1; AIG's SOMF ¶ 3; Pl.'s SOMF ¶ 4).

The policy defines "fraud or embezzlement" to include an "intentional perversion of truth by someone other than you or a **family member** perpetrated in order to induce you or a **family member** to part with something of value." (emphasis in original) (AIG Policy 41). And it defines "you" as "the person or persons named on the Declarations Page [i.e. Mr. Schurr] and his or her spouse who lives in the same household." (AIG Policy 6.)

After investigating Mr. Schurr's claim, AIG denied coverage for three independent reasons. First, it said that Mr. Schurr had not suffered a coverable loss because the funds were wired out of a bank account belonging to "'the Law Offices of Kenneth B. Schurr, P.A.,' a separate legal entity that was not insured by the Policy. . . ." (*See* Aff. of Kathleen Spinella ¶ 8, ECF No. 19 at 109.) Second, AIG said that "the loss was excluded from coverage due to the 'Business Or Professional Services' exclusion, which excludes 'any loss arising out of a business or professional service engaged in by you or a family member." (*Id.* at ¶ 9; AIG SOMF ¶ 4; Pl.'s Am. Resp. to AIG's SOMF ¶ 4.) Third, it asserted that the event was also subject to the "'Indirect Loss' exclusion, which excludes any loss that is an indirect result of any fraud guard event." (Aff. of Kathleen Spinella ¶ 9; AIG SOMF ¶ 4; Pl.'s Am. Resp. to AIG's SOMF ¶ 4.) AIG renews those arguments now at the summary judgment stage.

### 2. Legal Standard

Summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56. This standard applies even where cross-motions for summary judgment exist. *See Cafe La Trova LLC v. Aspen Specialty Ins. Co.*, 519 F. Supp. 3d 1167, 1174 (S.D. Fla. 2021) (Altonaga, J.). "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir.2004). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260.

At the same time, contract interpretation is a matter of law that the Court decides "by reading the words of a contract in the context of the entire contract and construing the contract to effectuate the parties' intent." *Feaz v. Wells Fargo Bank, N.A.,* 745 F.2d 1098, 1104 (11th Cir. 2014).

### 3. Discussion

In Florida, "insurance contracts are construed in accordance with the plain language of the polic[y] as bargained for by the parties." *Fayad v. Clarendon Nat. Ins. Co.*, 899 So. 2d 1082, 1086 (Fla. 2005) (alteration in original). Where "policy language is susceptible to two reasonable interpretations, one providing coverage and the other excluding coverage, the policy is considered ambiguous." *Id.* In such instances, the ambiguous "provisions are construed strictly against the insurer that drafted the policy and liberally in favor of the insured." *Id.* Ambiguous exclusionary clauses are "construed even more strictly against the insurer than coverage clauses." *Id*

Although the policy does not contain a governing law clause, it uniformly references the applicability of Florida law. (*See, e.g.*, AIG Policy 22, 26, 60, 62, 64.) The parties' briefs also argue Florida law. Against that backdrop, the Court finds that Florida law applies. *See Rollins, Inc. v. Parker*, 755 So. 2d 839, 841 (Fla. 5th DCA 2000) ("[w]hen contracting parties indicate in the contract their intention as to the governing law, any dispute under the contract will be governed by such law as long as it is not against the public policy of the forum state.").

Florida law also applies under the principle of *lex loci contractus*. *See Trumpet Vine Invs., N.V. v. Union Cap. Partners I, Inc.*, 92 F.3d 1110, 1115 (11th Cir. 1996) ("[i]n determining which law applies, a federal district court sitting in diversity must apply the choice of law rules of the forum state."); *Prime Ins. Syndicate, Inc. v. B.J. Handley Trucking*, Inc., 363 F.3d 1089, 1091 (11th Cir. 2004) ("[u]nder Florida's choice-of-law rules, *lex loci contractus* applies in contract matters . . . unless a statute modifies or abrogates a choice-of-law rule.") (cleaned up) (citing *Brown v. Case*, 86 So. 684, 685 (Fla. 1920)). "'*Lex loci contractus*' provides that the laws of the jurisdiction where the contract was executed governs interpretation of the substantive issues regarding the contract." *Prime Ins. Syndicate, Inc.* 363 F.3d at 1091 n.1 (citing *Lumbermens Mut. Cas. Co. v. August*, 530 So.2d 293, 295 (Fla.1988)). Indeed, the policy reflects Florida addresses for both parties (AIG Policy 1) and the record does not suggest that the contracting occurred in another state.

Having reviewed the record and relevant legal authorities, the Court concludes that: (1) the policy's language covers the loss; (2) the policy's business exclusion does not bar recovery; and (3) the policy's indirect loss exclusion does not bar recovery.

### A. The policy's language covers the loss.

AIG argues that the loss "is not covered by the Policy because the loss was suffered by a legal entity that is not a named insured under the Policy."

(AIG's Mot. 9.) Mr. Schurr responds that he—not his law firm—suffered the loss because the lost funds were his personal assets, which he kept separate from client and law firm funds held elsewhere. (Pl.'s Resp. 2, ECF No. 26; Dep. of Kenneth B. Schurr 17:1-18, 19:5-10, 28:15-18, ECF No. 25-4.) According to him, the "sole purpose of parking [his] personal funds in that particular account was to take advantage of a higher money market rate available at that time on certain accounts." (Corrected Aff. of Kenneth B. Schurr ¶ 4.)

Despite the many efforts dispensed on ascertaining the ownership of the lost funds, the policy's language requires no such determination. The policy plainly says that AIG will "pay [Mr. Schurr] for loss of money . . . resulting directly from fraud, embezzlement or forgery perpetrated against [him]." (*See supra* at 1-2; AIG Policy 42.) Contrary to AIG's assertions, nowhere does that language require Mr. Schurr to prove that he suffered the loss or prove that the lost funds were his. The plain language merely requires that there be *some* loss and that the fraud leading to that loss be perpetrated *against* Mr. Schurr.

Neither party disputes the existence of the loss or the fact that it resulted from fraud. (AIG's SOMF ¶ 7; Pl.'s Am. Resp. to AIG's SOMF, ¶ 7; AIG's Mot. 11, 14; Dep. of AIG's Corp. Rep. Kathleen Spinella 69:25-70:4, ECF No. 25-3.) As such, the true question is: Against whom was the fraud perpetrated?

AIG's answer is "the law firm":

> Q: I'm sorry. I'll ask again. Who was defrauded?
>
> A: Kenneth B. Schurr, P.A.
>
> . . .
>
> Q: And the reason that you answer that is because the money that was wired out was in an account titled Kenneth B. Schurr, P.A.? That's the reason for your answer, right?
>
> A: Yes.

(Dep. of AIG's Corp. Rep. Kathleen Spinella, 65:14-16, 66:3-7.)

That reasoning fails. First, AIG cites no case law to back the notion that the title on the account determines whom the fraud was perpetrated against. Second, the evidence indicates that the fraudster targeted Mr. Schurr specifically. To be sure, the record contains no indication that the fraudster targeted the law firm through its e-mail address for service (*see* Dep. of Kenneth B. Schurr 117:24-25), the e-mail account of Mr. Schurr's legal assistant, or otherwise purported to defraud the firm by posing, for example, as a vendor to whom the law firm owed money.

On the contrary, the record is clear that the fraudster targeted Mr. Schurr's communications concerning his personal debt by impersonating Mr. Schurr's creditor. (Corr. Aff. of Kenneth B. Schurr ¶¶ 1, 3; Promissory Note, ECF No. 1-4.) Nowhere does AIG contest that. And both parties acknowledge that Mr. Schurr filed a loss report with the FBI indicating that he was the victim of fraud under penalty of perjury. (Pl.'s SOMF ¶ 19; AIG's Resp. to Pl.'s SOMF ¶ 19.) Accordingly, the Court finds that the fraud was "perpetrated against" Mr. Schurr and that the policy's language covers the loss.

### B. The policy's business exclusion does not bar recovery.

Nevertheless, AIG says that the policy's business exclusion denies Mr. Schurr coverage. In the policy, "'[b]usiness' means a part time or full-time trade, occupation or profession, including farming or ranching other than incidental business." (*See* AIG Policy 6.) AIG argues that Mr. Schurr "was engaged in the business of money lending" because he previously made two interest-bearing loans to family members using other funds in the account. (*See* AIG's Mot. 15-17.)

However, in arriving at that position, AIG seemed to overlook the existence of the exemption for "incidental business" within the policy's definition of "business":

> Q: How could you have determined then that he – that the claim should be denied because he was in the money lending business when you didn't determine whether or not he was working full or part-time in the money lending business?
>
> A: Well, it wouldn't matter because it says either/or.
>
> . . .
>
> Q: [If] I loaned the money to my cousin Vinny and my cousin Vinny is paying me 4 percent on the loan. Am I in the business of loaning money?
>
> A: I guess so, yes.
>
> Q: Okay. So just the fact that you loan money to someone else and earn interest on it in and of itself means you're in the business of loaning money?
>
> A: Yes.

(Dep. of AIG's Corp. Rep. Kathleen Spinella 169:14-20; 194:2-11.)

Even assuming that the loans Mr. Schurr made to his family members qualified as "a business or professional service," the claimed loss cannot be

said to "arise out of" those loans. Indeed, Mr. Schurr made those loans in December 2018 and July 2019—well before the loss. (Dep. of Kenneth B. Schurr 87.) To recall, the business exclusion denies coverage for "any loss *arising out of* a business or professional service engaged in by [Mr. Schurr.]" (emphasis added) (AIG SOMF ¶ 4; Pl.'s Am. Resp. to AIG's SOMF ¶ 4.) For that reason, AIG's argument fails.

AIG also argues that the business exception applies because the lost funds were held in the law firm's name. That argument is simply at odds with the policy's text. The exclusion does not look to whether the *lost funds* resulted from a business or professional service. It looks to the *source* of the loss. In other words, the question is: Did the loss itself *arise out of* a business or professional service that Mr. Schurr engaged in?

The answer is no. The loss arose from the fraudulent wire instructions Mr. Schurr used to "pay down" his personal debt. AIG has not tied that debt to a "business" or professional service. *See Professional Service,* MERRIAM-WEBSTER LEGAL DICTIONARY, https://www.merriam-webster.com/legal/professional%20service ("a service requiring specialized knowledge and skill usually of mental or intellectual nature and usually requiring a license certification or registration.").

In short, neither the title on the account nor the nature of transactions unrelated to the loss are determinative here. Accordingly, the business exclusion does not bar Mr. Schurr's recovery for the reasons AIG presents.

### C. The policy's indirect loss exclusion does not bar recovery.

Last, AIG argues that Mr. Schurr only suffered an indirect loss under the policy, which goes uncovered per its terms:

> "Indirect Loss
>
> We do not cover any loss that is an indirect result of any **fraud guard event** including but not limited to:
>
> 1. You or a **family member's** inability to realize income that you would have realized had there been no loss or damage to **money**, **securities**, or **other property**;
> 2. Payment of damages of any type for which you or a **family member** are legally liable; or
> 3. Payment of costs, fees or other expenses you or a **family member** incur in establishing either the existence or the amount of loss under this endorsement other than those set forth under this endorsement."

(emphasis in original) (AIG Policy 45).

### (1) *The meaning of "indirect loss."*

The policy does not define "indirect" or "indirect loss." On one hand, AIG argues that the law firm suffered the direct loss—not Mr. Schurr—because the funds came from law firm's account. (AIG's Mot. 18.) On the other hand, Mr. Schurr says he suffered the direct loss because the funds were his personal assets and argues the indirect loss exclusion refers to consequential losses. (Pl.'s Resp. 11.)

In other words, AIG focuses the "indirect loss" inquiry on a *claimant's* proximity to the initial fraudulent loss, whereas Mr. Schurr reads the "indirect loss" inquiry to turn on a given *loss'* proximity to the *initial fraudulent loss*. The Court agrees with Mr. Schurr's reasonable reading of the exclusion to refer to consequential losses that stem from the initial fraudulent loss. But even if AIG's reading of the "indirect loss" exclusion were reasonable, the competing interpretations would give rise to an ambiguity under Florida law. *See Fayad*, 899 So. 2d at 1086. As a result, the Court would be bound to construe that ambiguity in Mr. Schurr's favor—particularly because the indirect loss provision is an exclusionary clause. *See id.*

In any regard, the Court's reading is consistent with the one adopted by the Second Circuit in *Horowitz v. American International Group, Inc.*, 498 Fed. App'x 51, 54 (2d. Cir. 2012). It is also consistent with testimony from the AIG supervisor overseeing the handling of Mr. Schurr's claim. (*See* Dep. of Patrick Flaherty 89:11-22, ECF No. 25-6.) In fact, Black's Law Dictionary equates an "indirect loss" with a "consequential loss," meaning one "arising from the results of a damage rather than from the damage itself." LOSS, Black's Law Dictionary (11th ed. 2019). Against that backdrop, the Court turns its attention to AIG's arguments.

### (2) *AIG's arguments on "indirect loss."*

AIG says that paragraphs 1 and 2 of the indirect loss exclusion apply. (AIG's Mot. 18-19.) Paragraph 1 excludes coverage of losses related to Mr. Schurr's "inability to realize income that [he] would have realized had there been no loss . . . ." (AIG Policy 45.) Although AIG correctly asserts that paragraph 1 bars any recovery for interest foregone because of the fraudulent loss, paragraph 1 does not bar recovery for the loss that is the subject of this dispute.

Paragraph 2, which excludes indirect "damages," does not apply. AIG argues that "the fraudulent wire transfer resulted in the payment of damages for which [Mr. Schurr] was legally liable, since he was personally liable on the

loan . . . whose intended payoff was intercepted by the fraudster." (AIG's Mot. 18.) That argument is flawed.

AIG incorrectly construes Mr. Schurr's liability on a promissory note as a form of damages. The policy defines "damages" as "the sum required to satisfy any claim, covered by this policy, whether settled and agreed to in writing by us or resolved by judicial review." (AIG Policy 6.) However, using the policy's definition of "damages" (which specifically refers to sums covered by the policy) in the context of this exclusionary clause (which specifically describes sums that are *not* covered) would render the term meaningless. Further, elsewhere in the policy "damages" is cast in bold to indicate the use of a defined term whereas in this exclusion it is not. As such, the Court does not believe that the policy's definition of "damages" applies in paragraph 2.

To avoid rendering paragraph 2 meaningless, the Court reads it to refer to "damages" in the ordinary sense. *See* 11 Fla. Jur. 2d. Contracts § 163 ("an interpretation that gives a reasonable meaning and effect to all provisions in a contract is preferred to one that leaves a part useless or inexplicable."). "Damages" ordinarily refer to "[m]oney claimed by, or ordered to be paid to, a person as compensation for loss or injury." DAMAGES, Black's Law Dictionary (11th ed. 2019). A liability under a promissory note that has not been adjudicated simply does not represent a form of damages. Thus, AIG's argument with respect to paragraph 2 fails.

AIG also seems to argue that the loss to Mr. Schurr *is* consequential in that any loss he claims represents the loss he ultimately suffered "by having to pay off the personal loan after the original wire was intercepted." (*See* AIG's Mot. 18.) However, nothing in the record substantiates the notion that Mr. Schurr claimed a loss for any form of indemnification (either to himself or his law firm) that stemmed from the fraud. AIG even repeatedly characterizes the claimed loss as the fraudulent loss itself. (*E.g.*, Aff. of Kathleen Spinella ¶ 6; *see also* AIG's Mot. 9 ("the money lost as a result of the fraud was being held in a money market account in the name of [the law firm] . . . the loss, therefore, was suffered by [the law firm.]").) Because Mr. Schurr claimed the *original* loss—not damages *resulting* from it, this argument also fails.

For these reasons, the indirect loss exclusion does not bar Mr. Schurr's recovery.

### 4. Conclusion

In light of the above, the Court **grants** Mr. Schurr's motion for summary judgment (**ECF No. 25**) and **denies** AIG's motion (**ECF No. 19**). Per the policy's terms, Mr. Schurr is entitled to a recovery of $99,750. (*See* AIG's Mot. 20.) Mr.

Schurr may separately move to recover attorney's fees pursuant to Fla. Stat. § 627.428. All other pending motions are **denied as moot**.

**Done and ordered** in chambers, at Miami, Florida, on March 24, 2022.

_____
Robert N. Scola, Jr.
United States District Judge